NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

CHARLES A. LEAMER, JR.,

                    Plaintiff,                    CIVIL NO. 95-5105 (GEB)

        v.

THE STATE OF NEW JERSEY, et al.,

                    Defendants.                   **MEMORANDUM OPINION**

**BROWN, Chief District Judge**

        This matter comes before the Court upon Plaintiff Charles A. Leamer, Jr.'s (hereinafter

"Plaintiff") motion for partial summary judgment and habeas corpus petition and Defendants

State of New Jersey, Adult Diagnostic and Treatment Center, William F. Plantier, Scott Faunce,

Grace Rogers, Deborah Faunce, Essie Williams, Michael Mancuso, William Blake, Charles

Anderson, Brian Marsh, Waymon Benton, Linda Gorman, Pat Deming, Joseph Reiher, Wayne

Sager, Donna Klipper, George Blaskewicz, Michelle M. Levi, Dorthy Ward, Lawrence Turek,

Jeffrey Allen and Nancy Graffin (hereinafter "Defendants") cross motion for summary judgment

pursuant to Federal Rule of Civil Procedure 56.  The action was reassigned to the undersigned on

August 25, 2006, and briefing by the parties has been completed.  The Court has read and fully

considered all of the parties' submissions, and has conducted a hearing regarding the pending

motions on July 5, 2007.  For the reasons discussed below, Plaintiff's motion for summary

judgment is denied and Defendants' motion for summary judgment is granted in part and denied

in part.

I.      **BACKGROUND**

Plaintiff is currently an inmate in the New Jersey Adult Diagnostic Treatment Center (hereinafter "ADTC") in Avenel, New Jersey.  (Def. Opp., p. 4; Grace Rogers Aff., Exh. A). Plaintiff is serving an indeterminate term of incarceration for rape and assault with attempt to rape.  (Def. Opp., p. 4; Kowalski Aff., Exh. A).  Plaintiff's presentence report describes the events leading to his incarceration as follows:

> On 4-2-77, at approximately 3:26 am, [victim], age 43, of Millville, N.J. reported to Millville Police that she had just been raped.  She stated the rape occurred on State Highway # 55 between Delsca Drive and Sherman Ave., Vineland, N.J.  The attacker was described as approximately 30 years old, sandy blond hair, wavy, wearing a green vest type sweater, green shirt and pants.  The victim stopped on Highway # 55 to help the attacker who was out of gas.  The attacker was taken to the Garden State Gas Station, was brought back to the car and committed the offense by threatening the victim with a knife.

> On 8-11-77, at 2:48 am, [victim], age 23, of Millville, N.J. reported to Police that as she was making a phone call from a phone booth located at 4th. & Sassafras . . . a male subject, approximately 5'7" tall, with red hair & jeans, pushed in the phone booth and pulled a knife on her.  Subject said to her, "Keep qui[e]t and act normal", I want you to come with me, I want to talk to you".  The victim then stated, "No please, leave me alone, I have a six year old son at home waiting for me."  The subject then stated, "If you want to see your son again, do as I say." [Victim then escaped].

(Plt. Exh. E).  Plaintiff was sentenced in 1978 for the aforementioned crimes under the sex offender provisions of the now repealed Title 2A of the New Jersey Statutes.  (Plt. Exh. D). Under Title 2A, Plaintiff must show an advance in treatment to a point where the treatment staff deem that he is no longer a threat to society and can make a successful adjustment to the community.  (N.J.S.A. 2A:164-3).

On February 18, 1993, custody personnel searched Plaintiff's cell and computer.  During the search, custody personnel discovered a letter Plaintiff had composed that was addressed to

-2-

one of his therapists, Catherine Blandford.[1]   The letter contained several passages addressing

Plaintiff's feelings for Dr. Blandford, and are, in part, as follows:

> I'm also sorry about rushing out of your office the way I did at the end of that
> meeting.  It was New Year's Eve Day, and I didn't even wish you a Happy New
> Year. I guess I could try to clean it up with an excuse like; 'I had a lot on my mind
> after our talk', which would be true, but that would not be the real reason I ran
> out.
>
> The real reason is that by the end of our talk I felt very close to you.  I felt a lot of
> warmth and affection for you and wanted very much to hold you in my arms and
> give you a big hug, (which I'm sure you would not have appreciated).  No, it
> would not have been a 'sexy' hug!  It would have been a 'friendly' hug!  I just
> wanted to embrace you as a friend who means a lot to me and who I really care
> about!   . . .  You have the ability to draw tenderness from me like none of the
> others can, and in this place, feelings of tenderness and affection toward an
> attractive woman employee such as yourself is often seen as a 'sexual overture' on
> the inmate's part designed to gain the woman's favor so that he can manipulate
> her feelings and use her  . . .
>
> Until now I have never shared this part of myself with any therapist because they
> would have thought me crazy.  You have a good heart, and it is this extremely
> private part of me that I now wish to share with you.  It was my desire to open my
> soul to you and share all that is contained therein.  But because of the roles we are
> forced to play out as therapist and patient, this sharing of extreme emotional
> intimacy is simply not allowed and therefore, these thoughts and feelings can not
> be shared with you in open forum  . . .
>
> Both you and your friendship mean a <u>great deal</u> to me and instead of just being

---

[1]  Plaintiff asserts that this is the only reason he was placed in the Restricted Activities
Program (hereinafter "RAP").  Defendants assert that initially, Plaintiff was placed in RAP
because of a letter he wrote to an inmate at another facility which sought to arrange the hiring of
a hit man.  (Def. Opp., p. 6; Leamer dep., p. 10; Rogers Aff., Exh. E and F).  However, on
January 29, 1996, Plaintiff was visited by a psychiatrist who thereafter determined that Plaintiff
was "not on RAP as a result of psych. problems."  (Plt. Brief, p. 5, Plaisted Aff., Exh. M).
Further, in August of 1996, Plaintiff was released from RAP when a therapist who had been
assigned to Plaintiff in March of 1995 determined that Plaintiff had not presented the type of
behavior requiring confinement to RAP.  (Plt. Brief, p. 5, Plaisted Aff., Exh. N).  Finally, on
March 5, 2003, Investigator Mancuso of the Custody Department determined that "there is no
evidence to substantiate that Charles Leamer . . . was attempting to commit any illegal/prohibited
activities regarding the contents of Leamer's letter dated February 16, 1993 [the letter which
allegedly attempted to hire a hit man]."  (Plt. Brief, p. 10, Plaisted Aff., Exh. H).

> myself and allowing you see the person I really am inside, I became defensive because of the rumors and lies told by therapists in the past and thought that I had to prove these falsehoods to be untrue before you would like me and believe that my feelings of respect, admiration and affection for you along with my desire to share a close, personal friendship with you were honest feelings and not any kind of romantic overture or sexual lusting for you.

(Plaisted Aff., Exh. F) (Emphasis in the original).

These passages of the letter "indicated to the treatment staff at ADTC that he (Plaintiff) was a threat to Blandford." (Def. Opp., p. 6; Leamer Dep., pp. 10-11). Specifically, medical personnel determined that "[Plaintiff's] attempts to develop inappropriate relationships with female therapists and other staff demonstrated that [Plaintiff] was a danger to staff and required placement in RAP . . ." (Graffin Aff., p. 3). On February 18, 1993, the day of his cell search, Plaintiff was placed in RAP. (Plt. Motion, p. 6). Plaintiff was confined to RAP, which required that he stay in his cell at all times, including mealtimes. (Id.). Recreation was limited to five hours a week, and Plaintiff had to be escorted by two separate officers. (Id.). Additionally, Plaintiff's therapy was altered. Plaintiff was no longer permitted to meet with therapists and therapy was conducted via "writing therapy" as arranged by the therapist treating Plaintiff at the time. (Id.). This consisted of Plaintiff writing about his current thoughts and feelings, which would be read by the treating therapist. (Id. at p. 7).

Plaintiff remained in RAP for three and one half years. (Id.). However, the initial confinements regarding therapy were altered. (Def. Opp., p. 6). "[Plaintiff] was kept in RAP because he attempted to develop an inappropriate relationship with another therapist, Michelle Levi, in 1993." (Id. ; Rogers Aff., Exh. D, E and F). Specifically, on March 23, 1993, Plaintiff used graphic and "inappropriate" language in a letter he wrote to Levi. Thereafter, on June 9, 1993, Plaintiff met with Levi and proceeded to empty onto a table the contents of a package he

was carrying, referred to as a "suicide packet", which included a razor.  (Id.).  Plaintiff also told

Levi that she was referred to as the "institutional whore."  (Id.; Leamer Dep., p. 20).[2]

Prior to Plaintiff's cell search, Plaintiff had a number of incidents regarding his behavior

towards females.  In 1986, Plaintiff attempted to develop a relationship with the wife of another

inmate.  (Id.; Leamer Dep., p. 13).  In 1987, Plaintiff attempted to establish a relationship with a

corrections officer at ADTC.  (Id.).  Also in 1987, Plaintiff had attempted to arrange private

meetings with nurses at ADTC by writing to them and telling them he needed to tell them

something in confidence.  (Id.).

## II.   PROCEDURAL HISTORY

Plaintiff was charged in two separate indictments with assault with a deadly weapon, in

violation of 2A:90-3 and with rape, in violation of 2A:138-1.  (Presentence Report).  Plaintiff

plead guilty to rape in the first indictment and assault with attempt to rape in the second

indictment.  (Id.).  On May 5, 1978, Plaintiff received two indeterminate sentences, with the first

sentence not to exceed 30 years, and the second sentence not to exceed 12 years.  (Plt. Motion, p.

3).

On September 1, 1979, the State of New Jersey abandoned Title 2A for sex offenders and

adopted Title 2C.  Under Title 2A, indeterminate sentences with statutory maximums were

imposed.  An individual sentenced under Title 2A was required to remain in custody until such

time as the medical personnel felt that the individual was able to rejoin society, or until the

_____

[2]  Plaintiff asserts that his continued placement in RAP after the letter was found during
his cell search was not the result of additional behavior toward female personnel, but because
Plaintiff continued to write letters and written complaints which "angered" the custody staff.
Plaintiff refers to a specific instance in which Plaintiff and Sergeant Oakley of the ADTC
engaged in a verbal altercation in which Sergeant Oakley allegedly cursed Plaintiff out and called
Plaintiff a "letter writing piece of shit."  (Plt. Reply Brief, p. 10).

statutory maximum sentence was served.  Under Title 2C, an individual receives a maximum

sentence that can be and usually is under the statutory maximum, as well as mandatory parole

availability.  (Id. at p. 35).

After the State of New Jersey adopted Title 2C for sex offenders, it empaneled a

Resentencing Court to ensure that those sentenced under Title 2A would not endure a harsher

penalty than that they would have received under Title 2C.  (Plt. Motion, Exh. C).  Plaintiff went

before the Resentencing Court on three separate occasions, specifically, in 1980, 1985 and 1990.

Each time, Plaintiff was denied resentencing, based upon the theory that any sentence Plaintiff

would received under Title 2C would most likely be harsher than a sentence under Title 2A.  For

example, during at least one of the resentencing hearings, the Resentencing Court made clear that

if Plaintiff were to be sentenced under Title 2C, he would receive a sentence of 30 years

incarceration.  However, the Resentencing Court opined, if Plaintiff remained under Title 2A, he

would be eligible for release as soon as he could prove he was no longer a danger.  On that basis,

for each of the three resentencing hearings, Plaintiff was not resentenced.  (Id.).

On October 4, 1995, Plaintiff filed the instant civil action.  On January 30, 1998,

Plaintiff's Complaint was dismissed.  In 2003, the Third Circuit reversed the District Court's

dismissal and reinstated Plaintiff's civil action.[3]  Plaintiff amended his Complaint on January 31,

---

[3]  The district court had previously granted the motion to dismiss on the grounds that a §
1983 claim was unavailable to Plaintiff as he sought to challenge his sentencing and should
proceed by habeas corpus.  The Third Circuit held that Plaintiff's RAP challenge was actually
seeking to challenge a condition of confinement, which was properly brought under § 1983.  The
Third Circuit further held that Plaintiff maintained a liberty interest in treatment for purposes of
both procedural and substantive due process as he was sentenced under Title 2A, which
predicated Plaintiff's term of incarceration on his response to treatment.  The Third Circuit also
held that "pro forma" reviews not based on actual medical evaluations of Plaintiff's condition
and/or progress would be violations of procedural due process.

2005.  Count One alleges that RAP violates Plaintiff's due process rights and seeks injunctive

relief and damages pursuant to Title 42, United States Code, Section 1983.  (Compl., ¶ 136).

Count Two alleges that Plaintiff was denied parole eligibility, a state-created liberty interest,

without due process of law, in violation of 42 U.S.C. § 1983.  (Compl., ¶ 142).  Count Three

alleges 8th Amendment violations.  (Compl., ¶ 156).  Count Four alleges violations of Article I,

Paragraph 12 of the New Jersey State Constitution.  (Compl., ¶ 159).  Count Five and Count Six

seek habeas corpus relief.  Count Seven alleges equal protection in violation of 42 U.S.C. § 1983.

## III.    STANDARDS OF REVIEW

### A.    Summary Judgment

A party seeking summary judgment must "show that there is no genuine issue as to any

material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ.

P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Orson, Inc. v. Miramax

Film Corp., 79 F.3d 1358, 1366 (3d Cir. 1996); Healy v. New York Like Ins. Co., 860 F.2d 1209,

1219, n.3 (3d Cir. 1988), cert. denied, 490 U.S. 1098 (1989); Hersh v. Allen Prod. Co., 789 F.2d

230, 232 (3d Cir. 1986).  The threshold inquiry is whether there are "any genuine factual issues

that properly can be resolved only by a finder of fact because they may reasonably be resolved in

favor of either party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986) (noting that no

issue for trial exists unless there is sufficient evidence favoring the nonmoving party for a jury to

return a verdict in its favor).  In deciding whether triable issues of fact exist, the Court must view

the underlying facts and draw all reasonable inferences in favor of the non-moving party.  See

Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Pennsylvania

Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).

Rule 56(e) of the Federal Rules of Civil Procedure provides, in relevant part:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P. 56(e).  The rule does not increase or decrease a party's ultimate burden of proof on a claim.  Rather, "the determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case."  Anderson, 477 U.S. at 255-56.

Under the rule, a movant must be awarded summary judgment on all properly supported issues identified in its motion, except those for which the non-moving party has provided evidence to show that a question of material fact remains.  See Celotex, 477 U.S. at 324.  Put another way, once the moving party has properly supported its showing of no triable issue of fact and of an entitlement to judgment as a matter of law, for example, with affidavits, which may be "supplemented . . . by depositions, answers to interrogatories, or further affidavits," id., "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita, 475 U.S. at 586, n.12; see also Anderson, 477 U.S. at 247-48 ("[B]y its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion . . . the requirement is that there be no *genuine* issue of *material* fact.") (emphasis in original).

What the non-moving party must do is "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  Celotex, 477 U.S. at 324: see also

-8-

Lujan v. National Wildlife Fed., 497 U.S. 871, 888 (1990) ("The object of [Rule 56(e)] is not to replace conclusory allegations of the complaint . . . with conclusory allegations of an affidavit."); Anderson, 477 U.S. at 249; Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992) ("To raise a genuine issue of material fact . . . the [non-moving party] need not match, item for item, each piece of evidence proffered by the movant" but rather must exceed the 'mere scintilla' threshold.), cert. denied, 507 U.S. 912 (1993).  Here, the material facts are undisputed, and thus, the matter is ripe for summary judgment.

## B. Habeas Corpus

Section 2254 of Title 28, United States Code, provides that the district court "shall entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

Under 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act, 28 U.S.C. § 2244 ("AEDPA"), federal courts in habeas corpus cases must give considerable deference to determinations of the state trial and appellate courts.  See Duncan v. Morton, 256 F.3d 189, 196 (3d Cir.), cert. denied 534 U.S. 919 (2001); Dickerson v. Vaughn, 90 F.3d 87, 90 (3d Cir. 1996)(citing Parke v. Raley, 506 U.S. 20, 36 (1992)).

Section 2254(d) sets the standard for granting or denying a writ of habeas corpus.  The statute reads as follows:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In <u>Williams v. Taylor</u>, 529 U.S. 362, 412-13 (2000), the Supreme Court explained the application of § 2254(d)(1).  The Court analyzed subsection 1 as two clauses:  the "contrary to" clause and the "unreasonable application" clause.  The Court held that under the "contrary to" clause, "a federal court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  <u>Id.</u>  A federal court may grant the writ under the "unreasonable application" clause, if "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  <u>Id.</u> at 413.  Habeas relief may not be granted under the "unreasonable application" clause unless a state court's application of clearly established federal law was objectively unreasonable; an incorrect application of federal law alone is not sufficient to warrant habeas relief.  <u>See</u> <u>id.</u> at 411; <u>see also</u> <u>Werts v. Vaughn</u>, 228 F.3d 178, 197 (3d Cir. 2000), <u>cert.</u> <u>denied</u>, 532 U.S. 980 (2001); <u>Matteo v. Superintendent, SCI Albion</u>, 171 F.3d 877, 891 (3d Cir.), <u>cert.</u> <u>denied</u>, <u>Matteo v. Brennan</u>, 528 U.S. 824 (1999).  Thus, the federal court must decide whether the state court's application of federal law, when evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent.  <u>See</u> <u>Werts</u>, 228 F.3d at 197; <u>see</u>

-10-

also Jacobs v. Horn, 395 F.3d 92, 100 (3d Cir. 2005).

With regard to 28 U.S.C. § 2254(d)(2), a federal court must confine its examination to evidence in the record.  See Abu-Jamal v. Horn, 2001 WL 1609690, at *12 (E.D. Pa. December 18, 2001).  In addition, the state court record should be reviewed to assess the reasonableness of the state court's factual determinations.  See id.  Finally, federal courts are required to apply a "presumption of correctness to factual determinations made by the state court."  Id.; see also 28 U.S.C. § 2254(e)(1).  The Court of Appeals for the Third Circuit has ruled that this presumption of correctness can be overcome only by clear and convincing evidence.  See Duncan v. Morton, 256 F.3d 189, 196 (3d Cir. 2001)(citing 28 U.S.C. § 2254(e)(1)).  "A finding that is well-supported and subject to the presumption of correctness is not unreasonable."  Abu-Jamal, 2001 WL 1609690 at *12 (citing Duncan, 156 F.3d at 198).

Furthermore, federal habeas courts ordinarily refrain from revisiting credibility determinations as "it would be wholly inappropriate for a federal court to repastinate soil already thoroughly plowed and delve into the veracity of the witnesses on habeas review."  Sanna v. Dipaolo, 265 F.3d 1, 10 (1st Cir. 2001).  A habeas petitioner therefore "must clear a high hurdle before a federal court will set aside any of the state court's factual findings."  Mastracchio v. Vose, 274 F.3d 590, 597-98 (1st Cir. 2001).

**IV.   ANALYSIS**

Plaintiff moves for partial summary judgment for Counts One, Two, Five, Six and Seven. Plaintiff argues that he was confined to RAP without due process because said confinement was conducted without a "real" hearing, notice or review of his order of confinement to RAP. Additionally, Plaintiff argues that he has been denied equal protection under the law because he

has not been provided with adequate, effective treatment.  Finally, Plaintiff argues that his continuing confinement at ADTC is illegal under 28 U.S.C. § 2241(c)(3) because of his indeterminate maximum sentence, and because his medical care was drastically limited under the 1995 privatization of prison medical care.

Defendants oppose Plaintiff's motion and submit a cross motion for summary judgment. Specifically, Defendants argue that Plaintiff has not been subjected to atypical or significant conditions of confinement.  Further, Defendants argue that Plaintiff was afforded all the process he was due, and that the therapy provided Plaintiff satisfies the requirements of due process and New Jersey law.  Defendants assert that the RAP program is not defined as "punishment" and that RAP does not violate due process.  Defendants also assert that the Eleventh Amendment bars an action for damages against a state in federal court brought by the citizens of said state or another state.  Defendants further argue that the ADTC and the State of New Jersey cannot be considered "persons" as that term is defined in a § 1983 claim.  Finally, Defendants assert that Plaintiff's efforts for habeas relief under § 2241 should be denied because they are procedurally barred, both as untimely and for failure to exhaust.

### A.    New Jersey Sex Offender Act of 1950

In 1950, the New Jersey Legislature enacted the Sex Offender Act.  The intent of the Act was to provide treatment to those whose sexual criminal conduct demonstrated "a pattern of repetitive-compulsive behavior."  N.J.S.A. 2A:164-5.  Pursuant to the mandates of the Act, a sentence under Title 2A of the New Jersey statutes required a sentencing judge to sentence a proposed defendant to an indeterminate term of imprisonment not to exceed the maximum statutory sentence set forth for the crimes by which said defendant was convicted.  Artway v.

Pallone, 672 F.2d 1168, 73 (3d Cir. 1982) (referencing State v. Lee, 60 N.J. 53, 54-57, 58, 286 A.2d 52 (1972) (" . . .in cases where treatment is not effective, prisoners are to remain institutionalized for the protection of society for the maximum period for which they could have been criminally sentenced for the crime involved").

No minimum term could be set by a sentencing judge, and the defendant would only be entitled to release prior to the statutory maximum if the Special Classification Review Board concluded that the defendant would be able to make "an acceptable social adjustment in the community." N.J.S.A. 2A: 164-6, 8. Further, no defendant sentenced under the Sex Offender Act was entitled to good time or work credits. N.J.S.A. 2A:164-10.

In August, 1978, with an enactment date of September 1, 1979, the New Jersey Legislature altered the 2A sexual predator code with the passage of Title 2C, which most pertinently added a punitive component at sentencing. Gerald v. Commissioner, 201 N.J.Super 445 (App. Div. 1985). Further, under Title 2C, sex offenders were no longer banned from good behavior/work performance time credits. After the enactment of Title 2C, the New Jersey Supreme Court directed that a three-judge sentencing panel be created to consider defendant petitions by those who had previously been sentenced under Title 2A. See 104 N.J.L.J. 489 (Dec. 6, 1979). The three-judge panel has since been disbanded.

As previously stated, Plaintiff applied for resentencing by the three-judge panel three times (once in 1980, once in 1985 and once in 1990), and was denied each time. The panel based its decision on the theory that any new sentence under Title 2C could potentially be harsher than his current sentence under Title 2A because under Title 2A, Plaintiff could be paroled at any time the medical staff felt he was no longer a danger to society. See Plt.'s Brief, pp. 3-4.

**B.      Eleventh Amendment**

Defendants first contend that the Eleventh Amendment bars an action for damages against a state in federal court brought by the citizens of said state or another state.  Defendants further contend that the ADTC is part of the Department of Corrections, which is a state agency. Defendants argue that because the ADTC, the State of New Jersey and the individual state defendants in their official capacities have not consented to being sued for damages in federal court, they are entitled to immunity as a matter of law from any damages arising from Plaintiff's § 1983 claim.

The Supreme Court has held that suits against a State and state officials in their official capacity are barred by the Eleventh Amendment.  Will v. Mich. Dep't of State Police, 491 U.S. 58, 66-67 (1989); Csizmadia v. Fauver, 746 F. Supp. 483, 487 (D.N.J. 1990).  The Eleventh Amendment states:

> The Judicial power of the United States shall not be construed to
> extend to any suit in law or equity, commenced or prosecuted
> against one of the United States by Citizens of another State, or by
> Citizens or Subjects of any Foreign State.

U.S. Const. 11.  The Eleventh Amendment "has been interpreted to bar suits for monetary damages by private parties in federal court against a state or against state agencies."  Melo v. Hafer, 912 F.2d 628, 635 (3d Cir. 1990) (citing Kentucky v. Graham, 473 U.S. 159, 167 n.14 (1985); Edelman v. Jordan, 415 U.S. 651, 663 (1974)).  Suits may be brought, however, if the State has given its consent.  Kimel v. Florida Bd. of Regents, 528 U.S. 62, 73 (2000) ("for over a century now, we have made clear that the Constitution does not provide for federal jurisdiction over suits against nonconsenting States").

In the present case, Plaintiff fails to dispute Defendants contention on this point. Plaintiff's Amended Complaint seeks both injunctive relief and monetary damages. Thus, the Court concludes that Plaintiff's claims for damages against the State of New Jersey, the ADTC and the individual state defendants in their official capacities must be dismissed because they are barred by the Eleventh Amendment.

**C.      "Persons" Within the Meaning of § 1983**

Defendants assert that Count One, Count Two and Count Seven of Plaintiff's Amended Complaint seeks a remedy pursuant to § 1983 against defendants ADTC and the State of New Jersey. Defendants assert that Plaintiff alleges that these defendants violated his right to due process and equal protection. Defendants argue, however, that a plaintiff can only recover for the violations of federal constitutional rights committed under color of state law only where the actor is a person.

This Court has reviewed Plaintiff's Amended Complaint carefully, and agrees with Defendants that Plaintiff appears to assert in Counts One, Two and Seven that the ADTC and the State of New Jersey, along with other defendants, violated Plaintiff's due process and equal protection rights. However, neither the ADTC nor the State of New Jersey can be considered "persons" when asserting a § 1983 claim.

Specifically, to state a claim for relief under § 1983, a plaintiff must allege, first, the violation of a right secured by the Constitution or laws of the United States and, second, that the alleged deprivation was committed or caused by a person acting under color of state law. West v. Atkins, 487 U.S. 42, 48 (1988). Courts have held that the New Jersey Department of Corrections and state prison facilities are not "persons" under § 1983. Crabow v. Southern State

Correctional Facility, 726 F. Supp. 537, 538-39 (D.N.J. 1989).  Further, a state cannot be

considered a "person" under § 1983 pursuant to the holding of Quern v. Jordan, 440 U.S. 332,

350 (1978).

Therefore, Defendants ADTC and the State of New Jersey shall be dismissed from

Counts One, Two and Seven as they cannot be considered "persons" under § 1983.

### D.    Qualified Immunity

The Court next considers Defendants assertion that they are qualifiedly immune.  The

general rule of qualified immunity protects government officials from civil liability for any action

that "does not violate clearly established statutory or constitutional rights of which a reasonable

person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Courts have

repeatedly emphasized that qualified immunity is "an immunity from suit rather than a mere

defense to liability," and that as such, qualified immunity questions shall be resolved "at the

earliest possible stage in litigation."  Saucier v. Katz, 533 U.S. 194, 201 (2001).

Claims of qualified immunity are analyzed under a two-step process.  Id.  The Court must

first "determine whether the plaintiff has alleged the deprivation of an actual constitutional right

at all."  Sutton v. Rasheed, 323 F.3d 236, 250 n. 27 (3d Cir. 2003).  If the plaintiff has alleged

such deprivation, the Court must "proceed to determine whether that right was clearly established

at the time of the alleged violation."  Id.

The Court finds that Plaintiff has clearly alleged the deprivation of several constitutional

rights, including the 8th and 14th Amendments, each of which has been acknowledged by the

Third Circuit in a written opinion issued from Plaintiff's previous appeal.

Therefore, the Court must next consider whether these rights were clearly established at the time of the alleged violation, and whether a reasonable person would have known said rights. Saucier at 202.  "The contours of the right must be sufficiently clear that a reasonable policymaking official would understand that what he is doing violates that right."  Anderson v. Creighton, 483 U.S. 635, 640 (1987).

Here, the significant curtailment of freedoms otherwise afforded prisoners when someone is placed in RAP is a policy that all levels of the state government were aware.  Further, the failure of the government to place a limit on the amount of time a prisoner can be placed in RAP is also a policy (or a failure to institute a policy) that the government must also be aware. Finally, the inability of Plaintiff to obtain parole unless or until he receives the therapy needed to allow him to assimilate to societal norms is a policy that the government created and implemented, then repealed.[4]

Therefore, the Court finds that Plaintiff's rights were and are clearly established and sufficiently clear to those who create and implement their application.  Defendants' motion for summary judgment on the basis of qualified immunity is denied.

**E.    Due Process and Equal Protection Considerations for RAP and The New Jersey Sex Offender Statute under Title 2A - Plaintiff and Defendants' Motion for Summary Judgment as to Counts One, Two and Seven**

The Fourteenth Amendment of the United States Constitution declares " . . .nor shall any State deprive any person of life, liberty, or property, without due process of law . . ." Accordingly, a "liberty interest" of constitutional dimension may not be abrogated by governmental action without certain procedural safeguards.  U.S. Const. Art. XIV.   Further, the

---

[4]  As discussed, *infra*, whether or not Plaintiff received therapy during his placement in RAP is a question of fact.

Fourteenth Amendment of the United States Constitution provides that "no state shall . . . deny to any person within its jurisdiction the equal protection of the laws."  The Equal Protection clause mandates that all persons similarly situated be treated the same.  City of Cleburne, Texas v. Cleburne Living Center, 473 U.S. 432 (1985).

However, the constitutional principles of equal protection do not require that all persons be treated identically, only that any differences in treatment be justified by an appropriate state interest, and the State need only show a rational basis for a classification where the classification is not suspect.  Trantino v. Dept. of Corrections, 168 N.J.Super. 220, 226, 402 A.2d 947 (App.Div. 1979).

In order for a plaintiff to bring a successful claim for violation of equal protection, said plaintiff must show that the allegedly offensive categorization invidiously discriminates against the disfavored group.  Kranson v. Valley Crest Nursing Home, 755 F.2d 46, 52 (3d Cir. 1985). In the absence of invidious discrimination, a court cannot substitute its judgment in favor of the laws passed by the State in question.  Parham v. Hughes, 441 U.S. 347, 351 (1979).

A prisoner's constitutional rights are somewhat diminished in comparison to a non-incarcerated citizen.  However, prisoners do maintain some constitutional rights, including protection stemming from the Due Process Clause and Equal Protection Clause of the Fourteenth Amendment.  See Wolff v. McDonnell, 418 U.S. 539, 555-56 (1974); see also Sandin v. Conner, 515 U.S. 472, 484 (1995).

Under the Due Process Clause, a prisoner is provided certain minimum protections where his "life" or "liberty" are affected.  Id. at 556-57.  Prisoner disciplinary hearings are also subject to the due process clause and require procedures that satisfy same.  Edwards v. Balisok, 520 U.S.

646 (1997).  Further, the Supreme Court held that " . . . these interests [under due process] will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause . . . nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  Sandin at 484.

Whether a prison condition constitutes an "atypical and significant hardship" depends on what an inmate may reasonably expect to encounter as a result of his conviction in accordance with due process of law, the amount of time a prisoner was placed into disciplinary segregation, and whether conditions of the prisoners confinement were significantly more restrictive than those imposed upon other inmates.  Fraise v. Terhune, 283 F.3d 506, 522 (3d Cir. 2002); Shoats v. Horn, 213 F.3d 140, 142 (3d Cir. 2000).  Where adequate procedures are not met, a prisoner may bring a claim under Title 42, United States Code, Section 1983.  Id. at 554-55; Heck v. Humphrey, 512 U.S. 475, 482 (1994).

The Third Circuit has specifically considered the New Jersey Sex Offender Statute under Title 2A of the New Jersey Statutes and held that as long as the duration of incarceration for curative treatment does not continue beyond the statutory maximum sentence for the crime(s) by which a defendant is convicted, then said statute does not deny due process or equal protection of the laws.  See U.S. ex rel. Demeter v. Yeager, 418 F.2d 612 (3d Cir. 1969).

Additionally, the United States Supreme Court has held that placement in administrative segregation is not violative of a prisoner's liberty interests.  Sandlin v. Conner, 515 U.S. 472, 484 (1995).  The question therefore becomes whether the segregation and its conditions constitute an "atypical and significant hardship" in comparison to those similarly situated.  This very point was

acknowledged by the Third Circuit in Plaintiff's previous appeal.  See Leamer v. Fauver, 288

F.3d 532, 546 (3d Cir. 2002).  Further, as the Third Circuit noted, Plaintiff maintains a

fundamental liberty interest in receiving adequate therapy, without which Plaintiff cannot hope to

be paroled prior to the expiration of his statutory term.  Id. at 545.

　　　The questions then become whether Plaintiff suffered "atypical and significant hardship"

by being placed in RAP for three and a half years, and whether Plaintiff has been receiving the

therapy he is entitled to pursuant to the statutory scheme under which he was sentenced.  Id. at

544. ("Only successful therapy can shorten [Plaintiff's] incarceration.  Therapy is thus an

inherent and integral element of the scheme, and its deprivation is clearly a grievous loss not

emanating from the sentence.")

　　　 Here, as noted above, the parties differ as to what treatment was provided to Plaintiff

and as to whether said treatment was therapeutic or evaluative.  Id. at 546 ("We note that under

both Supreme Court and our own precedent, pro forma reviews that were not based on actual

evaluations of Leamer's clinical condition and progress would be violations of procedural due

process.") (citing Foucha v. Louisiana, 504 U.S. 71, 79 (1992)).  Plaintiff presents a list of very

limited reviews regarding his status, and states that these reviews were more pro forma than

therapeutic.  Defendants disagree and argue that there were numerous reviews and that they were

therapeutic in nature.  That determination, forming the basis as to whether Plaintiff's procedural

due process rights were violated, is a question of material fact that must be left to the

consideration of a jury at trial as to Counts One, Two and Seven which are the counts alleging

violations of 42 U.S.C. § 1983.

Further, as the Third Circuit has previously held, when there is a dispute of material fact as to why a prisoner is placed in RAP, then summary judgment must be precluded.  See Manasco v. Rogers, 80 Fed.Appx. 286 (3d Cir. 2003)(unpublished opinion) (holding that there was genuine issue of material fact in dispute precluding summary judgment for defendants as to whether plaintiff was placed in RAP based solely on "trumped-up charges," and as to whether he received adequate medical care . . .).

In the case at bar, Plaintiff alleges that Defendants placed him in RAP because of a letter written to a fellow inmate in which Plaintiff "attempted to arrange the hiring of a hit man."  (Def. Brief at p. 6).  However, Plaintiff argues that the prison investigative staff of the Custody Department had determined that the letter was part of a book Plaintiff was writing and that "there is no evidence to substantiate that Charles Leamer was attempting to commit any illegal/prohibited activities regarding the contents of Leamer's letter . . ."  Plaisted Aff., Ex. H, p. 2).  Defendants further argue that Plaintiff was placed in RAP because of a letter to a female therapist found on his computer, but never sent.  However, Plaintiff submits evidence in the form of statements by Dr. Morgenstern and by Dr. Gaffin which indicate that Plaintiff was not placed in RAP for psychiatric problems, and that letter writing is not an appropriate basis for placing an inmate in RAP.  See Plt. Brief, Ex. B and M.

This Court therefore concludes that Plaintiff has laid an adequate foundation placing into question the validity of his placement in RAP and as such, the Court is again precluded from finding in favor of summary judgment for either party as questions of material fact exist.  See Manasco.

Therefore, all summary judgment motions made by either party regarding Plaintiff's initial placement in RAP, the duration of time Plaintiff was kept in RAP, and whether Plaintiff received adequate therapeutic treatment during RAP shall be denied.

### F.    Habeas Corpus Petition

While Plaintiff, in his previous appeal to the Third Circuit, asserted emphatically that he was not seeking habeas relief, on remand he has amended his Complaint to expressly seek this relief in Counts Five and Six.  Defendants assert that these counts are procedurally barred due to Plaintiff's failure to exhaust state remedies.

A state prisoner applying for a writ of habeas corpus in federal court must first "exhaust[] the remedies available in the courts of the State," unless "there is an absence of available State corrective process[] or ... circumstances exist that render such process ineffective ... ."[5]  28 U.S.C. § 2254(b)(1).  See also Rose v. Lundy, 455 U.S. 509, 515 (1982); Lambert v. Blackwell, 134 F.3d 506, 513 (3d Cir. 1997), cert. denied, 532 U.S. 919 (2001) (finding that "Supreme Court precedent and the AEDPA mandate that prior to determining the merits of [a] petition, [a court] must consider whether [petitioner] is required to present [his or her] unexhausted claims to the [state's] courts").

The exhaustion requirement is intended to allow state courts the first opportunity to pass upon federal constitutional claims, in furtherance of the policies of comity and federalism. Granberry v. Greer, 481 U.S. 129 (1987); Rose, 455 U.S. at 516-18.  Exhaustion also has the

---

[5] Exhaustion of state remedies has been required for more than a century, since the Supreme Court's decision in Ex parte Royall, 117 U.S. 241 (1886).  The exhaustion doctrine was first codified at 28 U.S.C. § 2254 in 1948, see Rose v. Lundy, 455 U.S. 509, 516-18 (1982), and was the subject of significant revisions in the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. 104-132, 110 Stat. 1217 (April 24, 1996).

practical effect of permitting development of a complete factual record in state court, to aid the federal courts in their review.  Rose, 455 U.S. at 519.

A petitioner must exhaust state remedies by presenting his federal constitutional claims to each level of the state courts empowered to hear those claims, either on direct appeal or in collateral post-conviction proceedings.  See, e.g., O'Sullivan v. Boerckel, 526 U.S. 838 (1999) ("requiring state prisoners [in order to fully exhaust their claims] to file petitions for discretionary review when that review is part of the ordinary appellate review procedure in the State"); Ross v. Petsock, 868 F.2d 639 (3d Cir. 1989); 28 U.S.C. § 2254(c) ("An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.")  Once a petitioner's federal claims have been fairly presented to the state's highest court, the exhaustion requirement is satisfied.  Picard v. Connor, 404 U.S. 270, 275 (1971); Castille v. Peoples, 489 U.S. 346, 350 (1989).

The petitioner generally bears the burden to prove all facts establishing exhaustion. Toulson v. Beyer, 987 F.2d 984, 987 (3d Cir. 1993).  This means that the claims heard by the state courts must be the "substantial equivalent" of the claims asserted in the federal habeas petition.  Picard, 404 U.S. at 275.  Reliance on the same constitutional provision is not sufficient; the legal theory and factual predicate must also be the same.  Id. at 277.

Where any available procedure remains for the applicant to raise the question presented in the courts of the state, the applicant has not exhausted the available remedies.  28 U.S.C. § 2254(c). The Supreme Court has made clear that a § 2254 petition which includes unexhausted as well as exhausted claims, i.e., a "mixed petition", must be dismissed without prejudice.  In

other words, if any of the claims asserted in the habeas petition are unexhausted, the entire petition must be dismissed.  See Rose, 455 U.S. at 510 (this is referred to as the "total exhaustion" rule).  However, in Crews v. Horn, 360 F.3d 146 (3d Cir. 2004), the Third Circuit has held that, while district courts have the discretion to stay "mixed petitions", when an outright dismissal could jeopardize the timeliness of a collateral attack, a stay is the only appropriate course of action.  360 F.3d at 152.

Here, Plaintiff takes great effort to show that he requested time and again a resentencing, and that he was time and again denied said resentencing.  What Plaintiff fails to discuss, rather artfully, is that he never appealed his indeterminate sentence, or the denial of any of his resentencing petitions he previously filed.  There is absolutely no evidence presented by Plaintiff that the appellate state courts ever had the opportunity to consider Plaintiff's situation, in whole or in part.  Therefore, Plaintiff has failed to exhaust all remedies, and Counts Five and Six of his Amended Complaint shall be denied.

## V.    CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment shall be granted in part and denied in part.  Plaintiff's motion for partial summary judgment shall be denied.


s/Garrett E. Brown, Jr.
GARRETT E. BROWN, JR., U.S.D.J.


Dated: July 24, 2007